## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **CARRIE ANN SAYRE,** | ) | **CASE NO. 1:08CV2727** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |

Plaintiff Carrie Ann Sayre ("Sayre") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying her claim for Period of Disability ("POD"), Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Court vacates the final decision of the Commissioner and remands for further administrative proceedings consistent with this Order.

### I.  Procedural History

On June 23, 2005, Sayre filed applications for POD, DIB and SSI benefits alleging a disability onset date of October 6, 2001,[1] due to back pain.   Her application was denied both

---

[1]In a letter to the ALJ on March 11, 2008, Sayre changed her disability onset date to June 23, 2004.  (Tr. 285, 621-22.)

initially and upon reconsideration.  Sayre timely requested an administrative hearing.

On January 18, 2008, Administrative Law Judge Edmund Round ("ALJ") held a hearing during which Sayre, represented by counsel, testified.  Brett Salkin also testified as the Vocational Expert ("VE").  On May 27, 2008, the ALJ found Sayre had the residual functional capacity ("RFC") to perform a range of light work, but not her past relevant work and, therefore, concluded she was not disabled within the meaning of the Act.  The ALJ's decision became the final decision of the Commissioner after the Appeals Council denied further review.

The Court held oral arguments on July 28, 2009, limited to the issue of Sayre's pain disorder.  Supplemental briefs were then filed by the parties.

On appeal, Sayre claims that (1) the ALJ failed to properly evaluate her pain symptoms after finding her pain disorder to be a severe impairment; and (2) the ALJ improperly weighed the opinions of the treating and examining sources.

## II.  Evidence

### Personal and Vocational Information

Sayre was born on September 8, 1962, making her 45 years old at the time the ALJ's decision was issued.  (Tr. 67.)  She has a 10th grade education and past relevant work experience as a nursing assistant, deli worker, and security officer.  (Tr. 80, 83, 616.)  Her last recorded earnings occurred in 2001.  (Tr. 57.)

### Medical Evidence

On October 6, 2001, Sayre presented to the Southwest General Hospital emergency room with back pain after lifting a patient at work.  (Tr. 266-267.)  She was diagnosed with acute sciatica.  *Id*.  On exam, Sayre had low-back spasm, pain, and tenderness, but the straight-leg raising test was negative, and her muscle strength and motor and sensory function were normal.  (Tr. 265-267.)  On October 19, 2001, Sayre returned to the emergency room with back pain and sinus problems.  (Tr. 264-265.)  At this time, an x-ray was taken which revealed no fracture, subluxation, or lesions.  Sayre was diagnosed with thoracic/lumbar strain/sprain.  *Id.*

Sayre sought chiropractic treatment with Eldon Meeks, D.C., from October, 2001

2

through November, 2004.[2]  (Tr. 287-520.)  At the first examination in October 2001, Dr. Meeks noted that the "lumbar region was found to have a moderate level of discomfort when evaluated by palpation.  Examination of muscle tenderness and spasm found the following: lumbar musculature revealed severe tenderness. * * * Palpation revealed poor (grade +2 muscle strength of the lumbar myotomes. * * * Decreased R.O.M. was revealed today in the patient's lumbar region, in both active and passive ranges."   (Tr. 580.)  Dr. Meeks' plan for therapy included traction, trigger point therapy and neuromuscular exercise.  *Id.*  Sayre also was instructed to use cold packs and to perform specific exercises and stretches at home.  *Id*.  Dr. Meeks noted that Sayre's symptoms persisted over time with little fluctuation.  (Tr. 294-520.)  He repeatedly offered a poor prognosis for recovery, even though her range of motion improved.  (Tr. 303-520.)[3]

Between March 2002 and December 2004, Sayre was treated in the emergency room on numerous occasions mainly for sinus and respiratory issues.  She did, however, report neck pain in June 2004 resulting from an automobile accident that occurred approximately four months earlier.  (Tr. 238-239.)  The physical exam findings from these visits showed normal results, such as full range of motion in her arms and legs, normal muscle strength, normal sensory and motor function, and normal reflexes.  (Tr. 237-238, 244, 246, 251-252, 257.)

In July 2005, Dariush Saghafi, M.D., evaluated Sayre at the request of the state agency. He concluded that Sayre had low back pain and possible spinal nerve-root disease at the L5 level along with other pain complaints.  (Tr. 149-152.)  Sayre complained that she had to crawl up her stairs in her home due to severe pain.  (Tr. 149.)  Dr. Saghafi found that Sayre had normal range of motion, except for being able to bend backwards 25 degrees, rather than the normal 30

---

[2]Dr. Meeks' records were provided to the ALJ on March 11, 2008, approximately two weeks prior to the date the ALJ's decision was issued.  (Tr. 285.)

[3]Dr. Meeks' practice was purchased by Christopher Ciryak in November 2006 which explains why a portion of the exhibit displays Ciryak's name.  He states in a letter that he was not involved with the care or treatment rendered to Sayre, but was only custodian of the file after purchasing the practice from Dr. Meeks.  (Tr. 287.)

degrees.  (Tr. 156.)  He noted that she had normal sensory and motor function, normal muscle
strength, and normal reflexes.  (Tr. 150-156.)  Further, he noted that Sayre performed
inconsistently when doing the straight leg raise on the right – she was able to accomplish up to
80 degrees without pain on some occasions, but on others she had pain at 30 degrees and below.
(Tr. 150.)  He also stated that she "demonstrates significant functional weakness on
confrontation but demonstrates full strength using techniques of distraction."  *Id.*  Dr. Saghafi
opined that Sayre was "unable to lift, push, pull, bend, walk, or stand for very long or us[e]
heavy loads according to history."  (Tr. 151.)  X-rays taken on July 26, 2005, of Sayre's neck
and lower back were normal.  (Tr. 147-148.)

On August 3, 2005, Sayre presented to the Fairview Hospital emergency room after she
was involved in an automobile accident.  (Tr. 159.)  She reported that the entire left side of her
body hurt.  *Id.*  She was examined and diagnosed with left hand, arm, and leg bruising, and neck
and low back strain.  *Id*.  X-rays of her left hand, pelvis, lower back, neck and chest were normal.
(Tr. 159-165.)  Later that day, she followed up with Brian Miller, M.D., who diagnosed her with
cervical, dorsal, and lumbosacral strain, and left-sided sciatic radiculopathy.  (Tr. 180.)  On
August 18, 2005, she complained to Dr. Miller that she could not stand or sit very long, and the
only way she could obtain relief was by lying on her left side.  (Tr. 177.)  Sayre continued to see
Dr. Miller through September 15, 2005.  (Tr. 175-79.)

On August 17, 2005, Myung Cho, M.D., a state agency consulting physician, conducted
an RFC assessment and concluded that Sayre could lift 20 pounds occasionally and 10 pounds
frequently, and she could stand and/or walk and sit for 6 hours, with no pushing or pulling
limitations.  (Tr. 167.)  He opined that Sayre could occasionally stoop, crouch, and climb
ladders/ropes/scaffolds, with no other limitations.  (Tr. 168.)  Dr. Cho concluded that Sayre's
symptoms were attributable to a medically determinable impairment, but the severity and effect
on function that she alleged were not consistent with the total medical evidence, rendering her
allegations only partially credible.  (Tr. 171.)

In January 2006, Bonnie Katz, Ph.D., a state reviewing psychologist, attempted to assess
Sayre's mental functioning due to her claim of depression.  (Tr. 193.)  After Sayre missed two

4

scheduled appointments, Dr. Katz stated that she had insufficient evidence to assess the severity of Sayre's allegations. *Id*.

In December 2006, Mark Allen, M.D., a treating physician Sayre visited for pain management, noted that she had nerve inflammation and degenerative disease in her lower back, migraines, and a pain disorder. (Tr. 197.) He suggested she see a psychologist. *Id*. Dr. Allen did not assess her functional capacity, asserting that such an appraisal would require an evaluation by a physical therapy department. (Tr. 196.) He did opine that she was unemployable and would have functional limitations for thirty days to nine months. *Id*. He noted that diagnostic testing showed "Chiari malformation on the Cervical MRI and herniated nucleus pulposus on the lumbar MRI." (Tr. 199.)

In January 2007, Lidiya Kanarsky, an occupational therapist, performed a physical capacity evaluation on Sayre. (Tr. 207-223.) She determined that Sayre could lift and carry a maximum of 20 pounds and 10 pounds frequently. (Tr. 207.) Sayre could sit for 35 minutes at a time and frequently throughout the day, could stand for 40 minutes at a time and occasionally throughout the day, and could walk for 20 minutes at a time and frequently throughout the day. (Tr. 213, 215.) Sayre was able to climb a set of four stairs, with a railing, five times. (Tr. 212.) She opined that Sayre's functional overall tolerance for sitting and standing was for part-time employment at a light job level. (Tr. 207, 210.) She also stated that Sayre should never use foot or hand controls, but could occasionally bend, reach overhead, climb, squat, kneel, crawl, and balance, and could frequently reach forward and perform repetitive arm and leg movements. (Tr. 215.)

Sayre visited Jill Mushkat, Ph.D., Psychologist, on February 9, 2007 and April 6, 2007. (Tr. 202, 205.) One of the stated goals of Sayre's therapy was to decrease her pain level by changing her medications. (Tr. 202.) The record did not indicate that any psychological testing was administered.

On March 27, 2007, on a follow-up visit with Dr. Allen, he noted that Sayre had undergone epidural blocks and experienced post-block headaches. (Tr. 203.) He diagnosed cervicalgia, cervical spondylosis, lumbar radiculitis, and lumbar spondylosis. *Id*. On exam, he

5

noted tenderness throughout Sayre's low back that worsened with forward and backward bending, however, the straight-leg raising test was negative.  *Id.*  Sayre again saw Dr. Allen on July 7, 2007.  He noted that Sayre's forward and backward bending, and straight-leg raising aggravated her lower back, but her neck range of motion was good.  (Tr. 283.)  Again he diagnosed lumbar radiculitis and lumbar spondylosis and planned to continue facet blocks and medications.  *Id.*

On August 4, 2007, Sayre went to the Fairview Hospital emergency room for low back pain after tripping over a chair while cleaning out her freezer.  (Tr. 225.)  On August 12, 2007, she saw Clay M. Kelly, M.D., who diagnosed her with low-back pain.  (Tr. 226-227.)  On exam, Dr. Kelly found that Sayre's neck, shoulder, and hip range of motion was normal, her gait was normal, she had some tenderness in her low back, and her low-back muscles were moderately taut.  (Tr. 226-227.)  He noted that an MRI, electromyography, and functional capacity outcome reports would have been helpful in further evaluation, but "the examination done today reveals only complaints of pain, with no real objective data to suggest ongoing back issues."  (Tr. 227.)  After reviewing the medical record of Dr. Allen, Dr. Kelly concluded that Sayre could work "full time at moderate duty with a 20-pound occasional lifting restriction."  *Id.*

On October 16, 2007, Dr. Allen examined Sayre and diagnosed her with lumbar radiculitis, spondylosis, and disk displacement.  (Tr. 281.)  He planned to continue medications and order a new MRI.  *Id.*  An October 29, 2007 MRI of Sayre's lower back showed degenerative features resulting in mainly mild or minimal changes, but "[n]o evidence of critical central canal or severe foraminal encroachment."[4]  (Tr. 272.)

**Hearing Testimony**

Sayre testified that she has not worked since October 2001 due to constant neck and back pain.  (Tr. 606, 609, 610.)  She stated that the pain limits her daily activities.  (Tr. 610.)  She also testified that her daughter does most of the housework and cooking, and helps Sayre out of the

---

[4]This MRI evaluation is the only one contained in the record, although Dr. Allen refers to the results of one done earlier.  (Tr. 199.)

bathtub.  (Tr. 610-611.)  She said that she cannot climb the stairs at her home, but instead crawls up and slides down.  (Tr. 610.)  When asked how long she can sit at one time, she testified that she cannot sit for more than ten minutes before needing to relieve her back pain by lying on the floor.  (Tr. 611.)  Also, she testified that she cannot sit and watch a television program without getting up and down constantly.  (Tr. 611, 612.)  When asked how far she can walk, she said that she cannot walk a two-block distance.  (Tr. 612.)  She further testified that she sleeps poorly and has crying spells.  (Tr. 613.)  Lastly, she stated that her medications sometimes make her nauseous, but relieve her pain.  (Tr. 611.)

Brett Salkin, the vocational expert, testified that Sayre's work history since 1993 included a nursing assistant position, a semiskilled occupation performed at a medium exertional level; a delicatessen worker, an unskilled occupation at the medium exertional level; and a security officer, a semiskilled occupation at the light exertional level.  (Tr. 616.)  The ALJ asked the VE to consider a hypothetical individual with Sayre's vocational profile.  This included an individual who could sit, stand or walk for six hours each during an eight hour day and lift, carry, push or pull 10 pounds frequently and 20 pounds occasionally.  *Id.*  Such an individual was precluded from using ladders, ramps and stairs; and could only occasionally stoop, kneel, crouch, and crawl.  *Id.*  Further, such an individual was limited to low stress tasks, and was precluded from tasks requiring arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.  *Id.*

The VE testified that the hypothetical worker could not do Sayre's past relevant work.  *Id.*  He did identify, however, a representative sample of jobs that she could perform, including positions as a cashier, sales clerk, or waitress, all of which are light, unskilled positions.[5]  (Tr. 618.)

---

[5]The VE testified as to the number of positions available in the economy as follows: As to the cashier position, 3,569 positions in the Cleveland metropolitan area; 25,000+ in Ohio, and 1.5 million in the national economy.  (Tr. 618.)  As to the sales clerk position, 9,100 in the Cleveland area; 51,000 in Ohio; and 1.8 million in the national economy.  *Id.*  As to the waitress position, 9,500 exist in the Cleveland area; 61,000 in Ohio and 1.6 million in the national economy.  *Id.*

Sayre's attorney presented a second hypothetical person to the VE with additional limitations as follows: "This hypothetical person can occasionally lift 10 pounds, can sit for 30 minutes at a time, can stand for 40 minutes at a time, can walk for 20 minutes at a time, and do all of that over the course of eight hours."  (Tr. 620.)  The VE testified that there would be no jobs for this hypothetical person.  (Tr. 621.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[6]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Sayre was insured on her alleged disability onset date, October 6, 2001, and remained insured through December 31, 2006.  (Tr. 14-21.)  Therefore, in order to be entitled to POD and DIB, Sayre must establish a continuous twelve-month period of disability commencing between October 6, 2001 and December 31, 2006.  Any discontinuity in the twelve-month period

_____

[6]The entire five-step process entails the following: First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairments meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.900(d) (2009).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988);
*Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when she establishes disability
within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*,
667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and
resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

After considering the entire record, the ALJ made the following findings regarding
Sayre:

1.  She has met the insured status requirements of the Act through December 31, 2006.

2.  She has not engaged in substantial gainful activity since October 6, 2001, the alleged onset date.

3.  She has the following severe impairments:   lumbar radiculitis, lumbar spondylosis, and lumbar disc displacement as well as an adjustment disorder and a pain disorder.

4.  She does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  She has the residual functional capacity to perform a range of light work. Specifically, she can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently and can sit, stand and/or walk for 6 hours each in an 8-hour day with normal breaks.  She cannot climb ladders, ropes or scaffolds.  She can occasionally stoop, kneel, crouch, crawl and use ramps or stairs.  She is limited to low-stress tasks and is precluded from tasks that involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

6.  She is unable to perform any past relevant work.

7.   She was born on September 8, 1962. She was 39 years old on the alleged disability onset date and was 45 years old, a younger individual, at the time the ALJ issued his decision.

8.   She has a limited, 10th grade education and is able to communicate in English.

9.   Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules used as a framework supports a finding that she is "not disabled," whether or not she has transferable job skills.

10.   Considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.

11.   She has not been under a disability, as defined in the Act, at any time on or after October 6, 2001 through the date of the decision.

(Tr. 14-21.)

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrate law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001)(*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Commissioner of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence

10

could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6ᵗʰ Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8ᵗʰ Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must consider whether the proper legal standard was applied. Failure of the commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6ᵗʰ Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6ᵗʰ Cir. 2006).

## VI.  Analysis

Sayre claims that the ALJ's residual functional capacity finding was not supported by substantial evidence.  Specifically, she contends that the ALJ failed to properly evaluate her pain symptoms after finding a pain disorder to be one of her severe impairments.[7]  Sayre also avers that the ALJ improperly weighed the opinions of the treating and examining sources.  The Commissioner contends that the record supports the ALJ's decision.

---

[7]A severe impairment is something that significantly limits a claimant's ability to do basic work activities, which in the case of a physical ailment means that it inhibits a claimant's ability to walk, sit, stand, lift, reach and carry.  20 C.F.R. § 404.1521; 20 C.F.R. § 921.  If it is determined that claimant has a severe mental impairment, the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment" and document the findings.  20 C.F.R. § 404.1520a(a), (b); 20 C.F.R. § 416.920a(a), (b).  In this case, the ALJ did not discuss Sayre's pain disorder.  He merely included it as one of her severe impairments by referring to Exhibit 7 of the record.  (Tr. 14.)  In that exhibit, Dr. Allen, Sayre's pain management doctor, listed it as a medical condition on the state's basic medical form.  He also expressed  in a letter to the Social Security Administration that Sayre was unable to work due to "intractable pain associated with lumbar radiculitis and degenerative disc disease" for a period of one month to nine months.  (Tr. 199.)  This is the sole documentation of Sayre's pain disorder.

11

The parties agreed at oral argument to the following definition of pain disorder:

> The essential feature of Pain Disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention. The pain causes significant distress or impairment in social, occupational, or other important areas of functioning. Psychological factors are judged to play a significant role in the onset, severity, exacerbation, or maintenance of the pain. The pain is not intentionally produced or feigned as in Factitious Disorder or Malingering. . . . Examples of impairment resulting from the pain include inability to work or attend school, frequent use of the health care system, the pain becoming a major focus of the individual's life, substantial use of medications, and relational problems such as marital discord and disruption of the family's normal lifestyle. . . . [A]ppropriate laboratory testing may reveal pathology that is associated with the pain. However, general medical conditions may also be present in the absence of objective findings. Conversely, the presence of such findings may be coincidental to the pain. . . . Pain may severely disrupt various aspects of daily life. Unemployment, disability, and family problems are frequently encountered among individuals with chronic forms of Pain Disorder.

American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders, 458-60 (4th ed. Rev. Text 1997)(DSM-IV-TR). Section 12.07 of the Listing of Impairments defines somatoform disorders as "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." Thus by definition, a pain disorder involves a significant discrepancy between objective medical findings and a claimant's allegations of pain. *Palmer v. Secretary of Health & Human Services,* 770 F.Supp. 380, 385 (N.D. Ohio 1991).

With regard to subjective claims of pain, it is well-settled that pain alone may be so severe that it constitutes a disability. *Palmer,* 770 F.Supp. at 385; *Shaver v. Secretary of Health & Human Services*, 839 F.2d 232, 234 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). In evaluating subjective pain allegations in a Social Security disability case, the ALJ must first determine whether there is a clinically determinable medical impairment that can reasonably be expected to produce the pain. *Palmer at 384*; *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986) *Makuch v. Halter*, 170 F. Supp.2d 117 (D. Mass. 2001); *see also Aubeuf v Schweiker* 649 F2d 107 (2d Cir. 1981). Additionally, there must be either (1) objective medical evidence to confirm the severity of the alleged pain, or (2) an objectively determined medical condition of such severity that it can reasonably be expected to give rise to the alleged pain. *Palmer* at 384*; McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1003 (6th Cir. 1988). Moreover, subjective claims of pain are not limited

12

to those resulting from physiological impairments, but include symptoms such as back pain resulting from mental impairments. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989); 20 C.F.R. § 404.1529; 20 C.F.R. § 416.929. Subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other objective medical evidence. *Janas v. Barnhart*, 451 F. Supp. 2d 483 (W.D. N.Y. 2006).

In *Palmer*, 770 F.Supp. at 380, the claimant was diagnosed with a somatoform pain disorder. The *Palmer* Court concluded that the ALJ erred in finding that Palmer's complaints of pain were not credible because objective medical findings were inconsistent with her complaints. *Id.* at 387. The court reasoned that a claimant with a pain disorder, by definition, may experience pain grossly in excess of what would be expected from the physical findings. *Id.*

At step three, the ALJ considered whether Sayre's impairments, separately or in combination, were medically equivalent to a listed impairment in Subpart P, App. 1, Listings 12.04 (Affective Disorder) and 12.07 (Somatoform Disorder). *See* § 1529(d)(2),(3); § 929(d)(2),(3). After finding that the combination of impairments did not meet either Listing, the ALJ analyzed how it impacted Sayre's RFC. *See* § 1529(d)(4); § 929(d)(4). The finding that one of Sayre's severe impairments was a pain disorder, which is psycholgically based, would necessarily involve some crediting of her subjective allegations of pain. *See Palmer* at 387. Instead, the ALJ ignored Sayre's severe impairment of pain disorder and found her statements regarding pain not credible. The ALJ then concluded that Sayre was not disabled and, in fact, retained the RFC to perform a range of light work. (Tr. 15.) He based this conclusion on the fact that her statements as to the intensity, persistence and limiting effects of her pain were not credible and that there was evidence of symptom magnification and embellishment. (Tr. 17, 18.) This conclusion, the Court finds, conflicts with the earlier determination that pain disorder was one of Sayre's severe impairments. Pain disorder, by definition, indicates that she suffers real physical distress rather than merely claimed distress resulting from symptom magnification or embellishment. An explanation of this conflict was warranted, but not offered by the ALJ.

The Commissioner tries to distinguish *Palmer* in two ways. He argues that the facts in *Palmer* were much more favorable to that claimant, and the ALJ in *Palmer* failed to consider the

13

objective medical evidence supporting the intensity and persistence of Palmer's pain.  (Doc. 20, Def. Supp. Br. at 4, 5.)  It is true that *Palmer* was a stronger case for the claimant because the finding of pain disorder was supported by a mental health professional relying upon a clinical evaluation and objective medical testing.  *See Palmer* at 384.  It may well be, as the Commissioner contends, that the ALJ would have been justified in finding that Sayre had no pain disorder or that it was not a severe impairment.  (Doc. 20, Def. Supp. Br. at 4.)  Be that as it may, in this case, as in *Palmer*, the ALJ did find the pain disorder to be a severe impairment, yet failed to articulate how that same finding related to his conclusion as to the credibility of the claimant's allegations of disabling pain.  While credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence.  *See Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (ALJ's RFC finding was flawed and therefore its use in determining claimant could return to her past relevant work was similarly flawed).  The decision of the ALJ cannot be upheld when the reasoning process is flawed.  *See Carridine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) (ALJ's decision cannot be upheld when the reasoning process used "exhibits deep logical flaws [citations omitted], even if those flaws might be dissipated by a fuller and more exact engagement with the facts.")

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Sayre can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir.1994) (the court can reverse the Commissioner's decision and award benefits only if all essential factual issues have been resolved and proof of disability is compelling).  When the ALJ misapplies the regulations or when there is not substantial evidence to support one of the ALJ's factual findings and his decision therefore must be reversed, the appropriate remedy is not to award benefits. The case can be remanded for further consideration.

The Court remands this matter for explanation and analysis in accordance with the cited federal regulations.  Having found remand is necessary, the Court need not consider Sayre's arguments regarding the evaluation of her treating and examining sources.

### VII.  Decision

For the foregoing reasons, the decision of the Commissioner is vacated and the case remanded for further proceedings consistent with this Order.

IT IS SO ORDERED.

  s/ Greg White
United States Magistrate Judge

Date:   September 23, 2009